DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas that found appellant guilty of two counts of gross sexual imposition and imposed a sentence of two years as to each conviction, to be served concurrently.
 {¶ 2} For the following reasons, the judgment of the trial court is affirmed.
 {¶ 3} Appellant sets forth the following assignments of error:
 {¶ 4} "I. Murray's convictions were against the manifest weight of the evidence. *Page 2 
 {¶ 5} "II. Murray's convictions were not supported by sufficient evidence, and his Rule 29 motion should have been granted as to all counts.
 {¶ 6} "III. Murray's right to due process was violated because the indictment was so vague that he was unable to properly understand and defend against the charges.
 {¶ 7} "IV. The prosecutor engaged in misconduct by shifting the burden of proof to Murray, and otherwise engaging in improper arguments.
 {¶ 8} "V. Murray's sentence was unconstitutional under Foster because the trial court made findings of fact under R.C. 2929.14(B)."
 {¶ 9} This case originated from two indictments filed in December 2004, charging appellant with three counts of gross sexual imposition pursuant to R.C. 2907.05(A)(4) and three counts of rape pursuant to R.C.2907.02(A)(1)(b). At arraignment, the two indictments were consolidated under case No. CR04-3611. Trial to a jury began on October 11, 2005. At the close of the state's case, the trial court granted appellant's motion for judgment of acquittal as to one count of gross sexual imposition and one count of rape. The jury acquitted appellant of the remaining two counts of rape and found him guilty of two counts of gross sexual imposition. Appellant was sentenced to two years as to each conviction, to be served concurrently.
 {¶ 10} In his first assignment of error, appellant asserts that his convictions were against the manifest weight of the evidence. As his second assignment of error, appellant asserts that his convictions were not supported by sufficient evidence and that his Crim.R. 29 motion should have been granted as to all counts. These arguments will be *Page 3 
considered together as they are all based on an examination of the evidence presented at trial.
 {¶ 11} "Sufficiency" of the evidence is a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of the crime. State v. Thompkins (1997), 78 Ohio St.3d 380,386, 1997-Ohio-52. When reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. A conviction that is based on legally insufficient evidence constitutes a denial of due process, and will bar a retrial. Thompkins, supra, at 386-387.
 {¶ 12} In contrast, a manifest weight challenge questions whether the state has met its burden of persuasion. Thompkins, at 387. In making this determination, the court of appeals sits as a "thirteenth juror" and, after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."Thompkins, supra, at 38, citing State v. Martin, (1983),20 Ohio App.3d 172, 175. *Page 4 
 {¶ 13} Appellant was convicted of two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), which provides:
 {¶ 14} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 {¶ 15} "* * *
 {¶ 16} "(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."
 {¶ 17} It was undisputed that the victim in this case was nine years old.
 {¶ 18} R.C. 2907.01(B) defines "sexual contact" as "* * * any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."
 {¶ 19} In support of his first and second assignments of error, appellant cites to a lack of credible evidence, substandard investigation techniques by the police, and inconsistencies in the victim's testimony.
 {¶ 20} The jury heard extensive testimony from the victim, her mother, the nurse who examined the victim at the hospital, two police officers and several forensic scientists who analyzed evidence in this case. *Page 5 
 {¶ 21} The victim testified that she was nine years old when appellant, whom she sometimes called "Dad," molested her over a period of about three weeks. The victim lived in an apartment in Toledo with her mother and grandmother, two brothers and appellant, who at the time was her mother's boyfriend. She testified that on Thanksgiving day 2004, when the rest of the family was at her grandparents' nearby apartment, appellant called her into one of the bedrooms in their apartment. Appellant sat her on his lap and "pulled me back and forth on his penis." The victim testified that she did not tell anyone because appellant said he would hurt her if she did. She stated that about a week later, appellant rubbed her "against his penis" and pressed her "by my vagina." She testified that on other occasions, appellant "pressed" her vagina with his hands, kissed her "with his tongue," touched her breasts and, on one occasion, "kissed me on my vagina." She stated that when he touched her vagina it hurt.
 {¶ 22} The last incident occurred in the morning when the victim was sleeping on the couch in the living room. She awoke and felt appellant lying next to her "rubbing his penis on my leg." The victim testified that she then saw "white stuff on her leg and rubbed it with a blanket to remove it. She further testified that when her mother woke up and walked into the living room appellant told her to act like she was sleeping. Her mother told her to come into her bedroom but she continued to pretend to be asleep. When the victim got up to get ready for school, her mother asked her what happened. Her testimony was inconsistent as to whether or not she answered her mother's questions. During direct examination she stated that she did not tell her mother about the abuse; *Page 6 
during cross-examination, she stated that she told her mother everything. Later that morning, her mother came to her school to talk to her. They talked outside the school office and she told her mother what appellant had done. She testified that she returned to class and a few minutes later she was told to gather her belongings. Her mother took her to the hospital, where she had a physical exam and talked to a nurse and a detective.
 {¶ 23} The victim's mother testified as to the morning of December 10, 2004, when her daughter told her what appellant had been doing to her. Mother testified that when she got up and left her bedroom that morning she saw appellant and her daughter on the couch. Appellant was holding a blanket over her daughter. She told her daughter to go into her room and then left to talk to one of her sons. When she returned to the living room, her daughter had gotten up to get dressed for school. Mother stated that she sensed tension and tried to talk to her daughter. Whenever her daughter would get ready to say something, appellant would walk into the room and interrupt. Mother testified that her daughter did not tell her anything until later that morning. She drove to the school, talked to her daughter and took her to the hospital. When they returned to the car, appellant was there. He told them they should go home and talk but Mother insisted on going to the hospital. Appellant remained in the car while Mother and daughter went into the hospital. Mother testified that she was in the room while the nurse interviewed her daughter but said she did not participate. Mother stated that when the detective came to the hospital she spoke to him outside her daughter's presence and did not go into the examination room while he talked to her daughter. *Page 7 
 {¶ 24} Jennifer Butler, an emergency room nurse at St. Vincent's Hospital, testified as to her examination of the victim. Butler stated that she initially asked Mother what brought them to the hospital; the victim was present as Mother answered the question. When Butler spoke to the victim, Mother was not in the room. According to Butler's notes from the interview, the victim related the events of that morning, beginning with when she awoke and "felt my Dad's privates touching my leg." She told the nurse that when she looked at her left leg she saw something wet and white on it. The victim told Butler that "it happened" more than once and that one time appellant "kissed my privates." Butler used a rape kit to collect evidence and performed a physical exam. She stated that the victim showed some redness in the vaginal area but said that could be attributed to causes other than sexual abuse.
 {¶ 25} Officer Ella Zielinski testified that she was called to the hospital and spoke to Mother and the victim. She stated that Mother was present when she talked to the victim and said that no one interfered with the questioning or answered for the victim.
 {¶ 26} The jury also heard the testimony of Dwayne Winston, who conducts forensic identity testing for a private laboratory which was selected by mutual agreement of the state and the defense specifically to test the swabs taken of the victim's leg at the hospital. The test showed DNA from the victim as well as two other individuals, which complicated the interpretation. Appellant's characteristics were present in eight of the 13 possible genetic "markers." As a result, Winston decided to err on the conservative side and exclude appellant as a contributor. Winston stated that he was attempting to avoid *Page 8 
being "overly aggressive." He further testified that the third person's DNA could have been transferred to the victim's leg from her clothes or from wiping her skin with a blanket.
 {¶ 27} The state presented testimony from two forensic scientists with the Ohio Bureau of Criminal Identification and Investigation. Gabriel Feltner testified that he found no evidence of semen on the two blankets submitted to him for examination. He did find a "trace amount" of sperm on the victim's underpants and on the rape kit swabs of the victim's left leg. Julie Cox testified that although after testing she could not determine the source of the semen on the victim's underwear, appellant's DNA profile was included in the group of possible contributors which, based on statistics, could be from appellant or as many as three other individuals in a population the size of Toledo.
 {¶ 28} The final witness for the state was Detective James Trout. The detective testified that he interviewed the victim at the hospital outside the presence of her mother. He estimated he talked to the victim for ten minutes and said she appeared to him to be relieved to be able to tell somebody what she had been going through. Based on what the victim told him, Trout identified appellant as a suspect and later that day interviewed him at the police station.
 {¶ 29} The defense presented the testimony of Wayne Graves, a psychologist with experience evaluating children in cases involving allegations of sexual abuse. Graves testified as to accepted interviewing techniques for children. Based on his knowledge of the investigation in this case, Graves expressed concerns that Detective Trout's interview *Page 9 
with the victim was not recorded and was conducted, in his opinion, over a short period of time. Graves concluded that the detective's report made it difficult to understand what the victim actually told him.
 {¶ 30} The defense presented the testimony of another forensic scientist with a private laboratory who examined the victim's underwear. She testified that the lab's testing showed trace amounts of semen with a DNA profile from which appellant could not be excluded as a contributor.
 {¶ 31} Appellant testified on his own behalf. As to the morning of December 10, 2004, appellant testified that the victim had been lying next to him under a blanket on the couch while he sat there reading the newspaper. Appellant testified that all of the victim's testimony was untrue.
 {¶ 32} This court has thoroughly considered the entire record of proceedings in the trial court and finds that the state presented sufficient evidence from which, when viewed in a light most favorable to the state, a rational trier of fact could have found appellant guilty beyond a reasonable doubt of two counts of gross sexual imposition pursuant to R.C. 2907.05(A)(4). See, State v. Jenks (1991),61 Ohio St. 3d 259, syllabus. As this court has consistently affirmed, the trier of fact is vested with the discretion to weigh and evaluate the credibility of conflicting evidence in reaching its determination. It is not within the proper scope of the appellate court's responsibility to judge witness credibility. State v. Hill, 6th Dist. No. OT-04-035,2005-Ohio-5028 at ¶ 42. Further, based on the testimony summarized above and the law, this court cannot say that the jury clearly lost *Page 10 
its way or created a manifest miscarriage of justice by finding appellant guilty of the charges of gross sexual imposition. State v.Thompkins (1997), 78 Ohio St. 3d 380, 387, quoting State v. Martin
(1983), 20 Ohio App. 3d 172. Accordingly, we find that appellant's first and second assignments of error are not well-taken.
 {¶ 33} In his third assignment of error, appellant asserts that the indictment was so vague that he was unable to properly understand the nature of the charges and defend against them. Appellant argues that the state failed to provide any details other than "bare bones" allegations of misconduct expressed in the language of the relevant statutory section.
 {¶ 34} The record reflects that on January 27, 2005, appellant requested a bill of particulars. After an oral hearing, the trial court granted the request. On March 1, 2005, the state filed a six-paragraph bill of particulars which set forth the offenses charged, the time period during which the offenses were alleged to have occurred and the specific acts alleged in each count of the indictment. We therefore find that any vagueness that existed in the indictment was cured by the bill of particulars. Appellant's third assignment of error is not well-taken.
 {¶ 35} In his fourth assignment of error, appellant asserts that during closing argument the prosecutor engaged in improper behavior. Appellant argues that the prosecutor repeatedly stated her opinion that the victim and her mother were credible witnesses, tried to impose a burden of proof on the defense, commented repeatedly on *Page 11 
appellant's initial refusal to permit a swab to be taken for DNA testing, and grossly simplified the forensic evidence.
 {¶ 36} Generally, a prosecutor's conduct at trial is not grounds for reversal unless that conduct deprives the defendant of a fair trial.State v. Loza (1994), 71 Ohio St.3d 76, 78, 1994 Ohio 409. "The test for prosecutorial misconduct is whether the prosecutor's comments were improper and, if so, whether those remarks prejudicially affected the defendant's substantial rights." State v. Eley (1996),77 Ohio St.3d 174, 187, 1996 Ohio 323; State v. Lott (1990), 51 Ohio St.3d 160.
 {¶ 37} Prosecutors generally are entitled to considerable latitude in opening statement and closing arguments. State v. Ballew (1996),76 Ohio St.3d 244, 255, 1996 Ohio 81. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Richey (1992),64 Ohio St.3d 353, 362, 1992 Ohio 44; State v. McGuire (1997),80 Ohio St.3d 390, 402-403, 1997 Ohio 335. In addition, since isolated instances of prosecutorial misconduct are usually harmless, any alleged misconduct in the closing argument must be viewed within the context of the entire trial to determine if any prejudice has occurred. See Ballew, supra;State v. Lorraine (1993), 66 Ohio St.3d 414, 420.
 {¶ 38} Appellant does not cite to any specific statements in support of his first argument. The five-page portion of the state's closing argument to which appellant refers contains no instances of the prosecutor stating that the victim and her mother were credible witnesses. What we see in that portion of closing argument is the prosecutor's *Page 12 
comments on what the evidence showed and on inferences that might reasonably be drawn from the evidence.
 {¶ 39} Appellant further claims that the prosecutor attempted to impose a burden of proof on the defense by commenting that appellant had an obligation to explain how his DNA got on the victim's underwear and by referring to his initial refusal to permit a buccal swab to be taken for DNA testing. The record does not support these claims. Appellant does not cite to specific statements in closing argument where these claimed errors may have occurred and, upon our complete review of the transcript, we find no support for these arguments. Seven times during closing argument, the state referred, clearly and emphatically, to its burden of proving the elements of each of the offenses charged beyond a reasonable doubt. The prosecutor did not at any time incorrectly state the burden of proof; rather, she urged the jury to consider the credibility of each of the witnesses and the reasonableness of their testimony. Further, the prosecutor did not infer that appellant had an "obligation" to explain why his DNA was on the victim's underwear, although she did accurately comment that appellant, who testified at trial, did not explain the presence of the DNA. The prosecutor did, as appellant states, comment once on his refusal to allow a swab of his saliva until a court order was obtained; however, the prosecutor was merely summarizing the testimony and did not offer any opinion as to the value of that evidence. *Page 13 
 {¶ 40} Upon thorough consideration of the foregoing, we find that none of the prosecutor's comments during closing argument deprived appellant of a fair trial and, accordingly, appellant's fourth assignment of error is not well-taken.
 {¶ 41} In his fifth assignment of error, appellant states that the trial court made findings of fact at sentencing in violation ofState v. Foster (2006), 109 Ohio St.3d 1, 2006-Ohio-856. Appellee asserts that this assignment of error is moot since appellant had completed his two-year sentence as of the date the state's brief was filed. Appellant has not filed a reply brief asserting otherwise. Accordingly, we find this assignment of error moot.
 {¶ 42} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 14 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Thomas J. Osowik, J. CONCUR. *Page 1